[No. B201673. Second Dist., Div. Six. May 12, 2008.]

THE PEOPLE, Plaintiff and Appellant, v.
BRENDA JEAN ROSS, Defendant and Respondent.

COUNSEL

Christie Stanley and Kimberly Smith, District Attorneys, and Gerald McC. Franklin, Deputy District Attorney, for Plaintiff and Appellant.

Gregory C. Paraskou, Public Defender, and Michael Ganschow, Deputy Public Defender, for Defendant and Respondent.

OPINION

YEGAN, J.—There are dangerous people in county jail. Statutory and decisional law, founded upon sound public policy and common sense, have as their goal the minimization of violence in jail. As we shall explain, the trial court's order is at variance with this salutary goal. We reverse.

▮   The People appeal from an order setting aside the second count of a two-count information. (Pen. Code, § 995.)[1] The second count charged respondent with bringing a deadly weapon into a jail in violation of section 4574, subdivision (a). The issue is whether the statute applies to an arrested person who "involuntarily" enters a jail. We hold that where, as here, the arrestee lies to law enforcement or correctional officials by denying possession of a

---

[1] All statutory references are to the Penal Code.

weapon and enters the jail, the arrestee has violated section 4574. In such instance, the arrestee voluntarily chooses to enter the jail with the weapon.

## Facts

Respondent was arrested for assault with a knife (count 1). The police patted her down, but did not find a weapon. They transported her to the Santa Barbara County Jail.

Upon arriving at the jail, respondent was asked if she had a weapon on her person. The arresting officer, who participated in the booking process,[2] testified: "I make it a practice for every single person I take into Santa Barbara County Jail without fail to ask them, 'Do you have any narcotics, drugs, anything illegal, weapons, prior to going in here, you should tell me now.' I say that to everyone . . . ." Respondent said "no."[3] During the booking process another officer made a thorough search of respondent and found a knife "in the inseam of [her] undergarments near her left buttocks."

## Trial Court's Ruling

In granting the motion, the trial court said that respondent had not violated section 4574, subdivision (a), because she had not voluntarily entered the jail. Instead, she had been involuntarily brought into the jail pursuant to her arrest: "[U]nder the circumstances presented here where you have someone arrested, involuntarily brought to jail, . . . you can't lawfully charge them with bringing an item that they possess with them when they're arrested . . . ."

## Actus Reus and Involuntariness

■ "Except for strict liability offenses, every crime has two components: (1) an act or omission, sometimes called the actus reus; and (2) a necessary mental state, sometimes called the mens rea. [Citations.]" (*People v. McCoy* (2001) 25 Cal.4th 1111, 1117 [108 Cal.Rptr.2d 188, 24 P.3d 1210]; see also § 20.) Section 4574, subdivision (a), provides: "[A]ny person, who knowingly

---

[2] The arresting officer was asked, "When you arrived here at the sally port [of the jail], did you attempt to book [appellant] at that time?" The officer responded, "I did."

[3] The arresting officer was asked, "Did [appellant] indicate to you whether she had a weapon on her . . . ?" The officer answered, "[Appellant] did not respond. She said no, she didn't." Appellant argues that the officer's answer is ambiguous as to whether she remained silent ("did not respond") or expressly denied possessing a weapon ("[s]he said no, she didn't"). We find no ambiguity. The only way that the officer's answer makes sense is to construe "did not respond" as meaning that appellant did not respond in the affirmative to possessing a weapon. If "did not respond" were construed as meaning that appellant remained silent, the officer's answer would be inherently contradictory.

brings or sends into . . . any jail . . . any firearms, deadly weapons, or explosives, and any person who, while lawfully confined in a jail . . . possesses therein any firearm, deadly weapon, explosive, tear gas or tear gas weapon, is guilty of a felony . . . ." Here, the actus reus of the crime was bringing a deadly weapon into a jail. The mens rea was respondent's knowledge that she possessed a deadly weapon and that the location was a jail. (See Judicial Council of Cal. Crim. Jury Instns. (2007–2008) CALCRIM No. 2747.)

Respondent does not dispute the sufficiency of the evidence to establish the requisite mens rea. But she contends that, as a matter of law, the evidence is insufficient to establish the actus reus. According to respondent, the actus reus must be a voluntary act. Therefore, the statute applies only to persons who "voluntarily" enter a jail, such as inmate visitors. Since she "was brought involuntarily to the jail having been arrested for assault with a deadly weapon," respondent argues that the trial court properly set aside the second count charging a violation of section 4574, subdivision (a).[4]

█ "The question [here] is one of statutory interpretation, a core judicial function to which we apply an independent standard of review. [Citation.]" (*People v. Johnson* (2007) 150 Cal.App.4th 1467, 1481 [59 Cal.Rptr.3d 405].) "When construing a statute, a court's goal is 'to ascertain the intent of the enacting legislative body so that we may adopt the construction that best effectuates the purpose of the law.' [Citations.] Generally, the court first examines the statute's words, giving them their ordinary and usual meaning and viewing them in their statutory context, because the statutory language is usually the most reliable indicator of legislative intent. [Citations.] [¶] When the statutory language is ambiguous, a court may consider the consequences of each possible construction and will reasonably infer that the enacting legislative body intended an interpretation producing practical and workable results rather than one producing mischief or absurdity." (*Gattuso v. Harte-Hanks Shoppers, Inc.* (2007) 42 Cal.4th 554, 567 [67 Cal.Rptr.3d 468, 169 P.3d 889].)

█ The plain language of section 4574, subdivision (a), encompasses respondent's conduct. "Bring" means "to convey, lead, carry, or cause to come along from one place to another" or "to take or carry along with one." (Webster's Third New Internat. Dict. (1981) p. 278.) Respondent knowingly took or carried a deadly weapon into the jail after denying that she possessed

---

[4] A similar issue concerning section 4573 (knowingly bringing a controlled substance into a jail) is presently before the California Supreme Court in *People v. Gastello* (2007) 149 Cal.App.4th 943 [57 Cal.Rptr.3d 293], review granted June 13, 2007, S153170 [61 Cal.Rptr.3d 1, 160 P.3d 661] and *People v. Low*, review granted June 13, 2007, S151961 [2007 Cal.Lexis 5959].

a weapon. She therefore voluntarily chose to enter the jail with the weapon. The statute requires no more.

Even if the language of section 4574, subdivision (a), were ambiguous, we would still construe it as encompassing respondent's conduct. Respondent's contrary interpretation would defeat the legislative intent underlying the statute and would result in "mischief or absurdity." (*Gattuso v. Harte-Hanks Shoppers, Inc., supra,* 42 Cal.4th at p. 567.) The legislative intent is to deter persons from knowingly bringing deadly weapons into a jail, irrespective of whether they are under arrest or not. Pursuant to respondent's interpretation, the statute would have no deterrent effect as to arrestees who were involuntarily transported to jail. They could knowingly bring deadly weapons into jail with impunity, even though they had deliberately misled law enforcement or correctional officials by denying possession of any weapon.

Our interpretation of section 4574, subdivision (a), is supported by *People v. James* (1969) 1 Cal.App.3d 645 [81 Cal.Rptr. 845]. In *James* the trial court set aside an information charging the defendant with possessing a firearm while lawfully confined in a jail in violation of section 4574. The defendant admitted that he had possessed the firearm when he entered the jail, but had not told the jailer "because he was scared." (1 Cal.App.3d at p. 650.) In granting the motion to set aside the information, the trial "judge stated that 'there is nothing to indicate that the Defendant voluntarily took the weapon anywhere. He was under arrest.'" (*Id.,* at p. 649.) The appellate court concluded that the trial court's reasoning was erroneous: "It is sufficient from the facts of this case that [defendant] knowingly possessed a firearm while in jail, after he had ample time to surrender it to the jailer. The fact that [defendant] had no choice about going to jail is irrelevant. He knew he had the gun and he knew he should have turned it over to the jailer when he was booked. . . . The [defendant's] action comes within that proscribed by Penal Code section 4574." (*Id.,* at p. 650.)

Like the defendant in *James,* respondent "knew [she] had the [knife] and [she] knew [she] should have turned it over to the jailer when [she] was booked." (*People v. James, supra,* 1 Cal.App.3d at p. 650.) Respondent's conduct, therefore, also "comes within that proscribed by Penal Code section 4574." (*Ibid.*)

### *Distinguishable Sister-state Cases*

In support of her argument that the statute does not apply here, respondent cites three sister-state cases: *State v. Tippetts* (2002) 180 Or.App. 350 [43 P.3d 455]; *State v. Sowry* (2004) 155 Ohio App.3d 742 [2004 Ohio 399, 803 N.E.2d 867]; and *State v. Cole* (2007) 142 N.M. 325 [164 P.3d 1024]. In these cases

the courts interpreted statutes making it a crime to knowingly bring contraband into a jail. The courts concluded that the statutes did not apply where the defendant had drugs on his person at the time of his arrest and was involuntarily brought to jail by the police. The courts reasoned that criminal liability must be predicated on the commission of a voluntary act, and a defendant does not act voluntarily when he is brought to jail under arrest.

For example, in *State v. Cole, supra,* 164 P.3d at p. 1027, the court held that, "to be found guilty of bringing contraband into a jail . . . , a person must enter the jail voluntarily." Applying this holding to the facts before it, the *Cole* court concluded that the charge must be dismissed, even though the defendant had falsely told the booking officer that he did not possess any drugs: "[T]he undisputed facts show that Defendant·did not bring contraband into the [jail]; law enforcement brought him and the contraband in his possession into the facility. It is of no moment . . . that Defendant could have avoided the charge of bringing contraband into a jail by admitting to the booking officer that he possessed marijuana. The dispositive issue is that Defendant cannot be held liable for bringing contraband into a jail when he did not do so voluntarily." (*Ibid.*)

■ Obviously, we are not bound by these sister-state cases. We will not follow the law as declared by other states "where it is contrary to good policy. [Citations.]" (9 Witkin, Cal. Procedure (4th ed. 1997) Appeal, § 940, p. 982.) In any event, these cases are distinguishable for two reasons. First, they involve statutes which, though similar, are not identical to section 4574. Second, they involve drugs, not deadly weapons. The possession of deadly weapons by inmates of a penal institution presents a significantly greater risk of harm than the possession of drugs. Deadly weapons threaten the life and safety of correctional staff as well as other inmates. ■ Because of this serious threat to security, section 4574 was designed to totally proscribe the introduction of deadly weapons into penal institutions: "The clear intent of the Legislature in enacting Penal Code section 4574 was to maintain the· safety and security of this state's jails and road camps by totally proscribing the introduction therein of any firearms, deadly weapons or explosives. . . . [¶] It requires no imagination to picture the perils created by escaping convicts who are armed with what appear to be functional firearms, or the bloody riots that often ensue when such efforts prove only partially successful. Manifestly we cannot subject other inmates, their visitors or the guardians of our places of confinement, to risks created by gun wielding prisoners." (*People v. Carter* (1981) 117 Cal.App.3d 546, 550–551 [172·Cal.Rptr. 838].) " '[S]ection 4574 has a clear purpose: proscribing inmate possession of tangible items capable of use for armed attack and posing a serious threat to jail security.' [Citation.] Total proscription is necessary if inmates and officers are to be protected. [Citations.]" (*People v. Grayson* (2000) 83 Cal.App.4th 479, 486 [99 Cal.Rptr.2d 701].) "Effective protection of inmates and officers from armed

attack depends upon prohibition of possession of *all* deadly weapons in jail. [Citation.]" (*People v. Rodriquez* (1975) 50 Cal.App.3d 389, 396 [123 Cal.Rptr. 185].)

Section 4574, therefore, "is a stringent statute governing prison safety and serves an objective demanding relative inflexibility and relatively strict liability to problems compounded by inmate ingenuity." (*People v. Talkington* (1983) 140 Cal.App.3d 557, 563 [189 Cal.Rptr. 735]; accord, *People v. Grayson, supra*, 83 Cal.App.4th at p. 486.) In view of the overriding need "to protect inmates and officers from assaults with dangerous weapons perpetrated by armed prisoners" (*People v. Velasquez* (1984) 158 Cal.App.3d 418, 420 [204 Cal.Rptr. 640]), we are convinced that the state Legislature intended that the statute would apply to the facts of the instant case. An arrestee commits a sufficiently voluntary act to violate the statute if he or she knowingly brings a deadly weapon into a jail after having denied possessing such a weapon. Section 4574 does not give arrestees a license to lie to law enforcement or correctional officials. Respondent, therefore, was obligated to disclose her possession of the knife or suffer the criminal penalties imposed by the statute. She had no choice whether to go to jail, but she was afforded the choice to not violate section 4574. Had she been truthful at booking, she would not have entered the jail with the knife and would not have been charged in count 2.

*Fifth Amendment Claim*

Respondent contends that she had a Fifth Amendment right not to disclose her possession of the knife because disclosure would have incriminated her. The knife apparently was the weapon that respondent had used in the commission of the assault (count 1). Since her privilege against self-incrimination protected her from compulsory disclosure of the knife, respondent maintains that she could not have been lawfully convicted of violating section 4574, subdivision (a).

■ We disagree. Respondent's Fifth Amendment privilege permitted her to remain silent. It did not protect her from the consequences of lying to a law enforcement officer, who had properly inquired whether she possessed any weapons. Without *Miranda* warnings (*Miranda v. Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602]) law enforcement officials may subject an arrestee to questioning "necessary to secure their own safety or the safety of the public" and not "designed solely to elicit testimonial evidence from a suspect." (*New York v. Quarles* (1984) 467 U.S. 649, 659 [81 L.Ed.2d 550, 104 S.Ct. 2626].) "While the Fifth Amendment provides [suspects] with a shield against compelled self-incrimination, it does not provide them with a sword upon which to thrust a lie." (*State v. Reed* (2005) 280 Wis.2d 68

[695 N.W.2d 315, 325]; see also *Brogan v. United States* (1998) 522 U.S. 398, 404 [139 L.Ed.2d 830, 118 S.Ct. 805] ["[N]either the text nor the spirit of the Fifth Amendment confers a privilege to lie. '[P]roper invocation of the Fifth Amendment privilege against compulsory self-incrimination allows a witness to remain silent, but not to swear falsely.' "].)

*Disposition*

The order setting aside count two of the information is reversed.

Gilbert, P. J., and Coffee, J., concurred.

A petition for a rehearing was denied June 11, 2008, and the opinion was modified to read as printed above.